**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                        )
**JONATHON E. PESKOFF,**                )
                                                        )
              **Plaintiff,**                          )
                                                        )
       **v.**                                         )        **Civil Action No. 04-526 (HHK/JMF)**
                                                        )
**MICHAEL A. FABER,**                      )
                                                        )
              **Defendant.**                      )
_____)

**MEMORANDUM OPINION**

**I.      BACKGROUND**

As indicated in earlier opinions, the central question dividing these parties is the

sufficiency of the search done by the defendant Michael Faber for emails and other

electronically stored information in response to plaintiff Jonathon Peskoff's discovery

requests.  Specifically, Peskoff seeks emails from his tenure with NextPoint Management

("NextPoint") that he argues "are highly likely to contain information relating to the

ownership issues in this case, the suspect transactions identified in the Complaint and

other relevant matters." Plaintiff's Motion to Compel Discovery ("Pls. Mot.") at 8.  Faber

initially produced computer disks containing electronic documents, including emails, that

were obtained from Peskoff's computer, but these disks did not include any emails that

Peskoff received or authored between mid-2001 and mid-2003, nor did Faber explain

why two years of emails were not produced, where the emails might currently be located

within NextPoint's computer system or archives, or what specific steps were taken to

locate the emails. Id.

Instead, Faber contended that all emails from Peskoff's computer had been

produced.  <u>Defendant's and Non-Party Plaza Street's Memorandum in Opposition to
Plaintiff's Motion to Compel Discovery</u> ("Opp.") at 1.  According to Faber, "no
electronic documents have been withheld" and, if the sought-after emails were not on the
computer disks provided, then they no longer existed on the system.[1] <u>Id.</u> at 6-7.  When
Peskoff's employment ended, Faber's counsel "caused the creation of an archive of all
Peskoff electronic files, including documents stored on his computer hard drive, email,
and any other Peskoff electronic documents." <u>Id.</u>  According to Faber's counsel, this
entire archive was produced to Peskoff, and as a result, "[t]here is nothing more to
produce." <u>Id.</u> at 7.

In an earlier opinion, I provided detailed analysis of several possible locations
where emails and other electronic information could remain in the Defendant's system
following Faber's initial search for responsive electronic documents.  <u>See</u> <u>Peskoff v.
Faber</u>, Civ. A. No. 04-526, 2006 WL 1933483 at *5 (D.D.C. July 6, 2006).  After I
explained why the information that Faber provided to me about the initial search he
conducted "[told] me little, if anything, about the scope of Faber's search," I ordered
Faber to file "a detailed affidavit specifying the nature of the search" that he conducted,
after which I stated I may order additional searches or an evidentiary hearing based on
the submitted information. <u>Id.</u>

In response to my order, Faber's counsel submitted an affidavit that described the
previously conducted search for emails.  <u>See</u> <u>Declaration of William Davis Concerning
Defendant's Production of Peskoff Electronic Mail</u> [#55] ("Davis Aff.") ¶ 2.  In it,
Faber's counsel explained that he conducted an "investigation," without description, and

---

[1] NextPoint Management subleases space from Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, PC,

concluded that Peskoff's electronic documents existed in two places: (1) the hard drive of Peskoff's computer and (2) the Mintz Levin server, which stores all of NextPoint Management's electronic files. Davis Aff. ¶ 6.  He had Mintz Levin's information services department provide a copy of Peskoff's hard drive as of March 2004 on DVD, and one month later he asked Mintz Levin's information services department to archive Peskoff's email. Davis Aff. ¶ 9, 11-13.  When Plaintiff's counsel complained that the DVD did not contain any email from mid-2001 to mid-2003, Faber's counsel reviewed the DVD and swore under oath that he could "confirm that plaintiff's contention is incorrect.  I saw many electronic mail messages from the time period mid-2001 to mid-2003." Davis Aff. ¶ 23.  He did not know why Plaintiff "mistakenly believes" that the provided archive did not contain emails from this time period and accused Plaintiff of making a "false statement" in this regard. Davis. Aff. ¶ 24, 31.

Faber's counsel acknowledged the various mechanisms for locating electronic data outlined by the Court, but confirmed that, other than providing Peskoff with the email archive and copy of his hard drive, no other search was performed. Davis Aff. ¶ 25-30.  Moreover, though NextPoint employed an assistant, the only other files searched were those of Faber, who "separately searched his files and produced responsive documents and electronic mail." Davis Aff. ¶ 27.  No details of Faber's search were provided to the Court.  Thus, of the five possible locations where the Court explained electronic documents may exist, Defendant's search only involved two, each of which I found was questionable in its scope. Peskoff v. Faber, 240 F.R.D. 26, 29-30 (D.D.C. 2007).

---

("Mintz Levin"), and its electronic files are stored on Mintz Levin's server. Opp. at 6.

I therefore ordered Faber to conduct an additional search of all depositories of electronic information in which one could reasonably expect to find all emails to Plaintiff, from Plaintiff, or in which Plaintiff's name appeared, and to make the results of the search available to Plaintiff. Id. at 31.  I also ordered Defendant to file a statement under oath by the person who conducted the additional search, explaining how the search was conducted, of which electronic depositories, and how it was designed to produce and did in fact produce all of the emails described in prior orders. Id.  Finally, I ordered an evidentiary hearing to be held, at which the person who made the attestation was to testify and explain how he or she conducted the search, his or her qualifications to conduct the search, and why I should find that the search was adequate. Id.

I held such a hearing on June 19, 2007, but Faber did not appear.  Thus, the only information I have as to his search of his personal computer is from his counsel that "Mr. Faber separately searched his files and produced responsive documents and electronic mail." Davis Aff. ¶ 27.  Since Faber did not testify at the hearing and there were no representations made at the hearing as to how he conducted the search of his specific computer and what criteria he used to determine whether a file or email was responsive to Peskoff's discovery requests, I will construe Faber's failure to comply with my order against him and proceed to the other evidence.

I now turn to the evidence presented at the hearing and elsewhere in the record regarding the search for Peskoff's emails.

II.     **FINDINGS OF FACT**

A.      <u>**NextPoint's Business Practices and Retention of Electronic Documents**</u>

1.      Peskoff and Faber were managing partners of NextPoint GP, LLP, the general

        partner of the venture capital fund NextPoint Partners, LP.  The NextPoint

        Management Company, Inc. ("NextPoint"), was the vehicle for receiving the

        management fees due from the venture capital fund to NextPoint GP and for

        fulfilling NextPoint GP's management responsibilities to the fund.

2.      Email was the main communication tool for NextPoint employees.

3.      At the time of Peskoff's tenure with NextPoint, NextPoint employees consisted

        entirely of Peskoff, Faber, and an assistant to Faber, Ms. Ann Van Aiken. Mr. Jim

        MacIntyre was also affiliated with NextPoint as a "venture partner" who provided

        advising and consulting services. All four individuals had Nextpoint email

        accounts.

4.      The email system used by Peskoff, Faber, and other persons employed by or

        affiliated with NextPoint automatically deleted any item in the "Trash" or

        "Deleted Items" folder seven days after the user placed the item there.  In other

        words, a "Deleted" item remained accessible to the user for seven days after the

        user had hit the "delete" key for an email.  Any item in the Inbox or Sent folders

        was automatically deleted 180 days after its creation.

5.      A user could save an item in the NextPoint email system only by moving it into a

        subfolder created by the user.

6.      Users were advised of this policy.

7.    NextPoint subleases space from Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, PC ("Mintz Levin"), and all of NextPoint's electronic files are stored on Mintz Levin's server.

8.    Mintz Levin's server has a backup tape system for disaster recovery rather than for archival purposes for message or mailbox retention.  In other words, the entire Mintz Levin database was backed up nightly and can only be restored in its entirety.  In any event, backup tapes are overwritten every fourteen days with no archive copies retained.  There are, therefore, no backup tapes available that would contain email created when Peskoff worked at NextPoint.

**B.    Peskoff's Employment at NextPoint**

9.    Peskoff worked at NextPoint from the beginning of 2000 until approximately the end of January 2004.

10.   Peskoff's practice while at NextPoint was to create subfolders to organize and store email such that he moved or copied his email to the appropriate subject folder.

11.   In the last nine months of his employment with NextPoint, the relationship between Peskoff and Faber deteriorated.  As a result, the majority of Peskoff's communications with Faber were by email; indeed, there came a time when his only communications with Faber were by email.

12.   Peskoff retained the emails pertaining to the issues between him and Faber.

13.   By January 2004, Peskoff had consulted counsel about his relationship with Faber.  Peskoff had gained access to a NextPoint ledger account, accessible only

by password, and its contents led him to believe that Faber had done objectionable
things.

14.     Peskoff left NextPoint at the end of January 2004, and as of February 13, 2004, he
was no longer a managing member.  Peskoff's access to his email account was
terminated in February 2004 following his departure from the company.  He left
NextPoint without the opportunity to print out whatever emails he wanted to keep.

**C.      Pending Litigation and the Preservation of Peskoff's Emails**

15.     Peskoff gave notice of potential litigation against Faber in a meeting of February
6, 2004, confirmed by letter of Faber's counsel of February 19, 2004.  Peskoff
filed his complaint in this case on March 31, 2004.

16.     In March 2004, following Peskoff's notice of potential litigation but prior to the
filing of the complaint, Faber's counsel, Mr. William Davis, requested that Mintz
Levin's information services department create a data file of all electronic
documents found on Peskoff's hard drive.

17.     In April 2004, following the filing of the complaint, Faber's counsel requested
that Mintz Levin's information services department archive all of Peskoff's email.

18.     At no point did Faber's counsel request preservation of backup tapes of Mintz
Levin's server.

19.     Luke Youmell has been employed in Mintz Levin's information services
department since September 2001.

20.     In April 2004, Youmell was asked by that firm's Information Technology director
to export all of Plaintiff's email to a PST file[2] for archiving purposes.

---

[2] A PST file is a portable file that results from exporting a particular user's email to it.

21.     On April 14, 2004, Youmell exported the contents of Peskoff's email account to the PST file, including any subfolders in that account and any mail in the "Deleted" folder.  To do so, Youmell used a software program called ExMerge, which permits a user to export all email related to one, specific user to a smaller file to archive its contents.

22.     Copies of the PST file were provided to Faber's counsel, and the original PST file remains on Mintz Levin's server.

**D.**     <u>**Production of Peskoff's Emails**</u>

23.     The DVD produced to Plaintiff's counsel contained a Microsoft Outlook tree under "Peskoff Personal Folder," which included an Inbox, a Sent folder, a Deleted Items folder and a Draft folder.  There was one draft in the Draft folder, but the other folders under "Peskoff Personal Folder" were empty.

24.     The DVD also contained a file called "Ex-merge," which included an additional Sent folder and sixty-six user-created subject folders.

25.     The sixty-six subject folders contained materials pertaining to many subjects, such as potential investments and information from news services pertaining to the technology industry.  Some subfolders, identified by the name of a person, contained emails primarily to and from that person.

26.     There was one subject folder that was labeled "NextPoint Issues," which contained approximately twenty-six emails, all from 2001.

27.     Another subject folder, called "Old Mail," contained approximately 11,000 items, 10,416 of which were in bold, signifying that they were unopened.  All emails in the Old Mail subfolder were from the period of approximately June 2003 to either

sometime in January or February 2004 or April 14, 2004; there were none from any other time period in the Old Mail subfolder.[3]

28. All of the emails in the subfolders, other than those in Old Mail, were dated from approximately mid- to late June of 2000 to July 2001.

29. Despite the email system being programmed to retain Sent items for 180 days, the Sent folder in the PST file contained only four emails, and all were dated February 10, 2004.

30. Despite the email system being programmed to retain Deleted items for seven days, the Deleted items folder in the PST file was empty.

31. Thus the PST file of Peskoff's email that Youmell created on April 14, 2004, contained no messages for a two-year period, from mid-2001 to mid-2003. The only email in Peskoff's archived account produced to Plaintiff was dated either prior to July 2001 or between 2003 and 2004.

32. Youmell also searched Van Aiken's current email account for messages containing the term "Peskoff" or his email address, jp@nextpointvc.com, in a manner that produced "any mail sent to, received from, or referring to Peskoff," assuming the messages contained the specific terms "Peskoff" or jp@nextpointvc.com. The resulting twenty "hits" (messages containing either term) were made available to Peskoff's counsel.

33. Youmell was not asked to examine Faber's email account, MacIntyre's account, or any other email account than that of Van Aiken and Peskoff.

---

[3] Testimony as to the date of the last email in the Old Mail subfolder is based on best recollections and is in conflict; Youmell recalls the last date as January or February 2004, see Transcript of Evidentiary Hearing, 6/19/2007 ("Tr. 6/19/2007"), at 27, while Plaintiff's counsel recalls the last date as April 14, 2004, see Tr. 6/19/2007 at 107.

34.     Youmell did not search the slack space[4] of Peskoff's computer due to lack of

resources.  Nor did Youmell search Peskoff's C drive on his individual computer.

Youmell searched only specific shared drives (the M and N drives) on Mintz

Levin's network to determine if Peskoff saved to or downloaded from those

network drives in addition to archiving what was in Peskoff's email account as of

April 2004.

35.     Additional searches that could be done with the tools available to NextPoint,

however, are futile.  Any additional search will require additional resources.


## III.     THE CONTROLLING LEGAL STANDARD

Faber and his counsel insist that all accessible emails responsive to Peskoff's

discovery request have been produced.  The production, however, raises many questions

as to its completion and the sufficiency of the searches performed.  The question then

arises whether it is time to appoint a forensic analyst who can search the network server

and the individual hard drives of Faber, Van Aiken, and, if it still exists, Peskoff to see if

any additional information can be retrieved, even if the author or recipient did not save

them in a folder.  The related question is, of course, who shall pay for such a forensic

examination.

The ready accessibility of information, whether electronically stored or not, does

not in itself require production of that information.  See Fed. R. Civ. P. 26(b)(1).  A

---

[4]  "The so-called 'slack space' of a computer is the 'unused space at the logical end of an active file's data and the physical end of the cluster or clusters that are assigned to an active file.' . . . Deleted data, or remnants of deleted data, is often found in a computer's slack space." Peskoff, 240 F.R.D. at 29 n.1 (internal citations omitted).

party's demand for information still must meet the most traditional and essential standard

of discoverability under the Federal Rules of Civil Procedure: that, on balance, the

burden of production is truly justified by its potential relevancy.  More specifically, the

pertinent Federal Rule of Civil Procedure provides that a court may deny a party's

demand for the discovery sought if:

> (i).    It is unreasonably cumulative or duplicative, or is obtainable from another source that is more convenient, less burdensome, or less expensive;
> (ii).   The party seeking discovery has had ample opportunity by discovery in the action to obtain the information sought; or
> (iii).  The burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, and the importance of the issues at stake in the litigation.

See Fed. R. Civ. P. 26(b)(2)(C).

The version of this rule that will become effective on December 1, 2007, makes

the standard in subsection (iii) somewhat clearer.  The revised subsection (iii) provides

that a court may limit the frequency or extent of discovery if:

> the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues.

H.R. Doc. No. 110-27 at 139.

An application of the above factors to the present case merits investigating the

cost of a forensic examination:

1.    **The needs of the case**.  The battle over the missing emails must now be brought

to a certain conclusion.  This controversy has stalled discovery for many months and it is

high time to decide once and for all whether any greater search for emails than the ones

conducted is worthwhile.

2.      **The amount in controversy**.  In his complaint, Peskoff demands $2.5 million.
As my earlier opinions indicate, I at least know of one claim that Faber diverted $400,000
to enrich himself at Peskoff's expense and a second similar claim of a diversion of
$150,000.  See Peskoff v. Faber, 230 F.R.D. 25, 29-30 (D.D.C. 2005).  The complaint
also speaks of another improper payment of $290,000. Complaint ¶ 23(b).  While it is, of
course, impossible to predict with numeric accuracy what is actually at stake, I am at
least convinced that we are not confronting a situation where the anticipated cost of doing
the forensic search will dwarf the final recovery.  See McPeek v. Ashcroft, 202 F.R.D.
31, 34 (D.D.C. 2001).

3.      **The resources of the parties**.  I have limited information about this factor at this
point.  All I can say is that Peskoff and Faber are sophisticated businessmen involved in
raising millions of dollars in venture capital.

4.      **The importance of the issues at stake**.  This is a commercial dispute and
therefore the public interest involved is in the court providing the parties, like all other
litigants, with a fair and efficient resolution of their controversy. See Fed. R. Civ. P. 1.

5.      **The importance of the discovery to the issue in the litigation**.  Application of
this factor can be challenging because the importance of the results of the forensic
examination to be had can only be accurately assessed after it is done.  Nonetheless, it
can be said that the information that has been produced thus far in this case permits the
court to infer the possible existence of additional similar information that warrants further
judicial action.  See Ameriwood Indus. Inc. v. Liberman, Civ. No. 06-524, 2006 U.S.
Dist. LEXIS 93380 *11 (E.D. Mo. Dec. 27, 2006) ("In light of the Samsung email, the

Court finds that other deleted or active versions of email may yet exist on defendants' computers."); <u>Zubulake v. UBS Warburg LLC</u>, 217 F.R.D. 309, 317 (S.D.N.Y. 2003) ("Zubulake herself has produced over 450 pages of relevant emails, including . . . emails that would have been responsive to her discovery requests but were never produced by UBS. These two facts strongly suggest that there are emails that Zubulake has not received that reside on UBS's backup media.").

Moreover, in weighing the factors against each other, it is important to bear in mind that there are two distinct periods of time in this case that must be treated quite differently.

## A.      **Following Notice of Pending Litigation**

The most recent time period commences with the notification of potential litigation by Peskoff on February 6, 2004 (affirmed by defense counsel's letter of February 19, 2004), through the date of Peskoff's departure and any continued activity of his email account. The Advisory Committee comments to amended Rule 37(f) make it clear that any automatic deletion feature should be turned off and a litigation hold imposed once litigation can be reasonably anticipated. As I recently stated:

> While the new amendment to Rule 37 of the Federal Rules of Civil Procedure indicates that, absent exceptional circumstances, a court may not impose sanctions on a party for "failing to provide electronically stored information lost as a result of the routine, good-faith operation of an electronic information system," it is clear that this Rule does not exempt a party who fails to stop the operation of a system that is obliterating information that may be discoverable in litigation. . . . [T]he advisory committee note to that Rule states: [the Rule] applies to information lost due to the routine operation of an information system only if the operation was in good faith. Good faith in the routine operation of an information system may involve a party's intervention to modify or suspend certain features of that routine operation to prevent the

> loss of information, if that information is subject to a preservation
> obligation. A preservation obligation may arise from many
> sources, including common law, statutes, regulations, or a court
> order in the case. The good faith requirement of [the Rule] means
> that a party is not permitted to exploit the routine operation of an
> information system to thwart discovery obligations by allowing
> that operation to continue in order to destroy specific stored
> information that it is required to preserve. When a party is under a
> duty to preserve information because of pending or reasonably
> anticipated litigation, intervention in the routine operation of an
> information system is one aspect of what is often called a
> "litigation hold."

Disability Rights Council v. Washington Metro. Transit Auth., 242 F.R.D. 139, 146

(D.D.C. 2007).

Thus, as to the most recent time period at issue, Faber's not turning the automatic

deletion feature off once informed of pending litigation may serve as a premise for

additional judicial action, including a sanction, without offending amended Rule 37(f).  It

is a legitimate exercise of discretion to require Faber to participate in a process to

ascertain whether a forensic examination can yield emails that were deleted after

February 6, 2004, because at that time Faber could reasonably anticipate that Peskoff

would sue him.

**B.      Prior to Notice of Pending Litigation**

However, as to the period of time prior to that, beginning with Peskoff's business

relationship with Faber and NextPoint until February 6, 2004, there was no impediment

whatsoever to Faber and NextPoint continuing to operate the email system and its

automatic deletion features as the system had operated before.  Even if the relationship

between Faber and Peskoff was degenerating at this point, there cannot be deduced from

its degeneration any obligation of Faber to shut off the automatic deletion features of the

email system.  To the precise contrary, amended Rule 37(f) indicates that "[a]bsent

exceptional circumstances, a court may not impose sanctions under these rules on a party for failing to provide electronically stored information lost as a result of the routine, good faith operation of an electronic information system."  I find no exceptional circumstances here and the automatic deletion features of the email system cannot be the basis for any sanctions in that period of time.

Nonetheless, Rule 37(f) must be read in conjunction with the discovery guidelines of Rule 26(b).  In doing so, as discussed above, I find that balancing the factors in Rule 26(b)(2)(C) authorizes me to require Faber to participate in a process designed to ascertain whether a forensic examination is justified because the emails are relevant, the results of the search that was conducted are incomprehensible, and there is no other way to try to find the emails.

First, I can begin with the premise that Faber never made any objection to Peskoff's document request and, as I have noted, it is common ground that the emails sought are relevant.  Second, quite simply, Faber has never explained to the Court how he searched his own computer.  Third, Mr. Youmell did not perform anything close to the possible comprehensive search of available areas for storing electronic information I previously described; indeed, he insisted that he lacked the tools to do so.  He merely gathered what he believed was Peskoff's email account on the day he downloaded it to the PST file.  Moreover, on the day he copied the file, Youmell at least should have found emails dating back to six months prior to the date of the download in the Sent folder and Inbox, roughly to November 2003.  He did not.  Indeed, the Inbox and Sent folders were empty or close to empty, and the Sent folder contained only four emails sent the same

date of February 10, 2004.[5]

We also have the uncontradicted testimony of Peskoff that he used his email both in his office and on his Blackberry to communicate with Faber and others for business purposes, and that he generally put email into specific folders organized by appropriate subject, meaning that they should not have been automatically deleted in accordance with NextPoint's email practice.  There is also at least one preserved email, produced at the hearing, in which Peskoff bitterly complains to Faber about Faber's supposedly giving himself a significant pay raise without consulting Peskoff.  Yet the search that was performed produced an utterly unorganized set of emails with lacunas that are difficult to understand on this record.  As I stated in my earlier opinion:

> Peskoff's review of the disks showed only emails from Peskoff's Outlook account; no other NextPoint employee emails were provided.  Nor were any emails contained in Peskoff's "Sent Items" or "Deleted Items" folder.  The emails produced included 14 unopened emails in the Inbox, all dated April 14, 2004; received emails dated June 2000 to June 2001 in 65 different subfolders; and approximately 11,000 emails in an "Old Mail" subfolder, 10,436 of which were unopened. All emails in the subfolder were dated between June 25, 2003, and April 14, 2004.[6]

Peskoff, 240 F.R.D. at 29 (internal citations omitted).

Peskoff testified that he put emails into subject folders consistently; Faber even insisted on his doing so as the best method for preserving documents.  But, there were no emails in the subject subfolders for the period between mid-2001 and mid-2003, meaning

---

[5] The sworn affidavit of Mr. Frederic Spindel claims that his review of the Inbox produced by Defendant included "14 received, but unopened, emails all dated April 14, 2004." Declaration of Frederic T. Spindel Concerning Defendant's Production of Peskoff Electronic Documents [#56] ¶ 6.  His hearing testimony, however, indicates that the Inbox contained "nothing." See Tr. 6/19/2007 at 105.  The Court will seek additional submissions from counsel to clarify this point.

[6] The testimony at the hearing suggests the most recent email in the subfolder "Old Mail" may have actually been dated January or February 2004. See Tr. 6/19/2007 at 27.  Counsel will be asked to confirm the date of the last email in the produced "Old Mail" subfolder.

that either (1) Peskoff lied and, for some reason, kept all of his email in his Inbox for that period only, without any way to retrieve email by subject, knowing that they would be destroyed in six months, or (2) Peskoff told the truth and some unknown person deleted each subject subfolder and its contents.  There is no explanation whatsoever for the phenomenon of the missing two years of emails, and I credit completely Peskoff's testimony that he created subject folders for the purposes of organizing and storing received emails.  The absence of emails in the Inbox, Sent and Deleted Items folders, and the subject folders thus is completely unexplained and remains inexplicable.  A forensic search may be the only means to attempt to understand what happened and to ascertain whether any more of the relevant emails can be found.

I hasten to add that the difference between these two periods of time bear on whether an additional search is warranted once the cost is ascertained.  It may be that the increased cost of doing a search for the period from the beginning of Peskoff's employment to six months before February 6, 2004, may not be justified under the factors identified in Rule 26(b)(2)(C), while the cost of doing so for the period beginning with six months prior to February 6, 2004, is justified.  It may also happen that the increased cost of doing a complete search for the entire time period from Peskoff's employment to his termination is marginal.  All of this remains to be seen.

## IV.    THE OBLIGATION TO SEARCH ACCESSIBLE DATA

A final point as to Faber's obligation to search accessible data.  In my earlier opinion I stated:

As I pointed out in my previous opinion, written before the new federal rules regarding electronic discovery became effective, the producing party has the obligation to search available electronic systems for the information demanded. The new Federal Rule of Civil Procedure pertaining to electronically stored information makes this explicit. Under the new pertinent rule, the producing party is relieved of producing specifically identified inaccessible data only upon a showing of undue burden or cost. Even then, the court may order discovery of the data identified as inaccessible "if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C)," i.e., the rule that balances the costs of the discovery demanded against its benefits. The obvious negative corollary of this rule is that accessible data must be produced at the cost of the producing party; cost-shifting does not even become a possibility unless there is first a showing of inaccessibility. Thus, it cannot be argued that a party should ever be relieved of its obligation to produce accessible data merely because it may take time and effort to find what is necessary.

Peskoff, 240 F.R.D. at 31 (internal citations omitted).  This portion of the opinion is said

to have created a per se rule that a party must search accessible data, irrespective of

whether the cost of the search is justified by the relevance of what may be found, and to

have "rejected Faber's cost-shifting request." H. Christopher Boehning and Daniel J.

Toal, *Peskoff, Cost-Shifting and Accessible Data*, N.Y.L.J., June 26, 2007 at 5, col. 1.

But Faber has never made any "cost-shifting request" under Rule 26(b)(2)(B), nor has he

ever contested the relevancy of the emails that Peskoff seeks.  See Peskoff, 2006 WL

1933483 at *4 ( "[T]here does not appear to be any dispute that the emails are likely to

contain relevant information. . . . The parties' disagreement turns instead on whether the

missing emails still exist and can be located.").  Thus, he has never invoked the rules to

argue that any greater search for the emails that he refuses to search is not justified by

their potential relevancy; he has simply argued that he has done enough to find them and cannot be required to do any more.

Since I persist in my view that a party must search available electronic systems to answer any discovery request not objected to, see McPeek v. Ashcroft, 202 F.R.D. 31, 32 (D.D.C. 2001), and since Faber has never argued that the search is unnecessary or irrelevant but only that Peskoff should pay for it, I am hard pressed to understand why I am required to, *sua sponte*, balance utility against cost and relieve Faber of searching accessible, relevant data any more than I would have to do the same balancing before I required him to look through the file cabinet outside his office for a paper file.

In other words, I readily concede that when the argument is made, the search for data, even if accessible, must be justified under the relevancy standard of Rule 26(b)(1). By performing the analysis under Rule 26(b)(2)(C), which assumes the relevancy standard under Rule 26(b)(1) is met, I do not mean to suggest the contrary.  The point is that that balancing under Rule 26(b)(2)(C) was not invoked here to oppose the search, and I cannot accept the proposition that  Faber may be relieved of searching accessible data when he does not argue that the search is not justified by the potential relevancy of what may be found.

V.       **CONCLUSION ON MOTION TO COMPEL**

The combination of Peskoff's testimony about his persistent use of email to communicate with Faber, the existence of at least one email that does just that, and my inability to understand why the search conducted produced such curious results, along with my application of the other factors previously described, convinces me it is now

appropriate to ascertain the cost of forensic testing of the computers and server at issue to see if it justifies a forensic search of them.  I am therefore going to order counsel for the parties to collaborate with me[7] on what can be described as a request for proposals seeking bids from qualified forensic computer technicians to perform an examination of all the computers that were owned by NextPoint in the period of Peskoff's employment and of the network server used by NextPoint during the same period to ascertain whether the following electronically stored communications may exist:

      1.        All emails sent to and received by Peskoff in that period;

      2.        All emails by whomever in which the word "Peskoff" appears anywhere in the email.

Once that search is completed and assuming that such information exists, the request for proposals will inquire what it will cost to convert the found emails into another readable format such as TIFF or PDF.  Then, with that information and the bids received, the Court will permit the parties to brief whether any of the proposals received should be accepted and, if so, who shall bear the cost of doing the search.  I assume that the bidders will respond to the request for proposals without cost in the hopes of ultimately securing the business.  If I am wrong in that assumption, the parties should advise me and counsel and I will have to convene to ascertain what to do.

I will order counsel for the parties to initially draft a request for proposals and then appear before me to begin the process of seeking bids.

---

[7] At first glance it may seem that my personal involvement is odd.  I have seen enough of this case to know that Peskoff and Faber despise each other and I have neither the time nor the patience for another intramural battle between them and their lawyers—who are not too crazy about each other either.

## VI.     DEFENDANT FABER AND THIRD PARTY NEXTPOINT

Faber's counsel, Mr. William Davis, acting now also on behalf of NextPoint, has

raised arguments at this late date that NextPoint, as a third party, was never obligated to

preserve any electronic documents. See Tr. 6/19/2007 at 128-30; Non-Party NextPoint's

Supplemental Memorandum Regarding Pending Motion to Compel Production of

Peskoff E-Mail [#62] ("NP Supp. Mem.").  He argues that Peskoff seeks the emails under

a Rule 45 subpoena to a non-party because Peskoff filed suit against Faber, not

NextPoint, and therefore the parties are not before the Court under any Rule 26 analysis.

Tr. 6/19/2007 at 130-39.  The Court finds the arguments unpersuasive.

First, Mr. Davis responded to Peskoff's potential lawsuit by letter of February 19,

2004, in which he stated that his firm "is co-counsel . . . to NextPoint Partners, L.P. (the

'Partnership'), NextPoint GP, LLC (the 'GP'), NextPoint Management Company, Inc.

(the 'Company') (together, the 'NP Entities'), and to Michael Faber and James W.

MacIntyer IV." See Letter of William Davis to Arthur E. Cirulnick, Esq. (then-counsel

for Peskoff), 2/19/2004, Attachment E to Answer [#3] at 1.  He also acknowledged

Peskoff "had made a number of allegations relating to the **NP Entities**, including certain

alleged misconduct by Mr. Faber" (emphasis added). Id.  He goes on to assert the rights

of "the NP Entities" specifically, not those of Mr. Faber, "to take any and all actions

deemed necessary and advisable with respect to Mr. Peskoff, his former employment

with the Company, and his disputed economic interest in the GP," and that he has

provided Peskoff's counsel "with documentary evidence to prove that Mr. Peskoff's

allegation regarding **the Partnership** is false" (emphasis added). Id. at 2.

At this point, no reasonable lawyer would believe that the NextPoint entities or Faber lacked a united interest in defense to any claims brought by Peskoff.  Nor would any reasonable lawyer read the letter authored by Mr. Davis and believe that demands made to NextPoint in a pending lawsuit must be made as that of a third party pursuant to Rule 45.  Finally, no reasonable lawyer would read the letter and presume that Faber was on notice of potential litigation to warrant a litigation hold but the other NextPoint entities were not on similar notice, or that there was no chance whatsoever that Peskoff might sue the NP Entities as well as Faber.  In fact, Mr. Davis acknowledges the potential consequences of any litigation brought by Peskoff to include "counterclaims" by Faber and NextPoint, see id. at 4, an acknowledgment that the NP Entities could be made defendants in a lawsuit Peskoff brought, thus leading to counterclaims as opposed to third-party claims by NextPoint against Peskoff.  Mr. Davis cannot feasibly argue, then, that  NextPoint was not on similar notice as Faber of potential litigation to merit a litigation hold on the email system, nor can he reasonably argue, as he did at the hearing, that in spite of the letter on behalf of Faber and all of the NP entities he authored in February 2004, the pending litigation was merely a threat "against Mr. Faber personally," unrelated to NextPoint. See Tr. 6/19/2007 at 129.

Nonetheless, Mr. Davis contends that the document requests require a Rule 45 subpoena.  See id. at 128.  But he failed to raise an objection to the document request on any third-party grounds in response, nor did he raise the argument in opposition to Plaintiff's motion to compel.  In fact, he responded to discovery requests in part on behalf of Faber, not NextPoint, producing multiple NextPoint electronic documents, including the contents of Peskoff's network computer files, and he responded to court orders to

continue searching for electronic documents at NextPoint on behalf of Faber. <u>See</u> <u>Supplement to Plaintiff's Motion to Compel Discovery</u> [#60] at 2-3.

Courts have found that failure to state any objections to the production of documents in a timely manner constitutes a waiver of any objections, similar to Rule 33, even though Rule 34 does not contain an automatic waiver provision. <u>Myrdal v. District</u> <u>of Columbia</u>, Civ. A. No. 05-2351, 2007 WL 1655875 (D.D.C. June 7, 2007); <u>Fonville v.</u> <u>District of Columbia</u>, 230 F.R.D. 38, 42 (D.D.C. 2005) (finding that failure to object to document production in a timely manner, like the failure to object to an interrogatory, constitutes an automatic waiver of any objections). Thus, any objection Faber has to the document request at this late date on the grounds that the request should have issued separately to NextPoint under Rule 45 is waived.  <u>See</u> Fed. R. Civ. P. 34(b).

Indeed, throughout discovery, Faber's counsel has never taken the position that discovery directed to NextPoint could not and should not be answered by Faber because NextPoint was a third party to the lawsuit.  In fact, Mr. Davis filed the opposition to Peskoff's motion on behalf of non-party Plaza Street and of Defendant—not NextPoint. <u>See</u> Opp. at 7.  Mr. Davis even referred to the motion to compel documents as being from "non-party Plaza Street ***and from defendant***." Opp. at 7 (emphasis added).  Now, however, Faber's counsel is submitting pleadings on behalf of NextPoint as a third party to oppose the document request and NextPoint's corresponding obligations under the federal rules. <u>See</u> NP Supp. Mem. at 1-3.  Yet at no point in the past several years of discovery has Mr. Davis ever filed any objections to Peskoff's motion to compel on behalf of NextPoint, nor has he ever entered an appearance on behalf of NextPoint as a third party.  Instead, he has acted on behalf of Faber in responding to discovery requests

and court orders directed to Faber, producing various documents from NextPoint.  It is hardly fair for Mr. Davis to now claim that "this was all about NextPoint's production, not about Mr. Faber's."  <u>See</u> Tr. 6/19/2007 at 128.

Had NextPoint wanted to take the position that it was a third party in the conflict between Peskoff and Faber, then Mr. Davis should have resisted any discovery served on NextPoint in the first place on the grounds that the information belonged to NextPoint and not to Faber.  Moreover, if Faber had needed authority to produce discovery on behalf of NextPoint, then no discovery should have been produced from NextPoint in response to Peskoff's discovery requests at all.

At any rate, Mr. Davis's argument, for practical purposes, is all much ado about nothing.  At most, Peskoff would now produce a subpoena under Rule 45, which requires analysis of the document production under the same balancing test of Rule 26(b)(2)(C), performed earlier in this Memorandum Opinion, insofar as NextPoint would claim that the electronically stored information, other than that it had already produced, is not reasonably accessible. Fed. R. Civ. P. 45(d)(1)(D).  Furthermore, insofar as NextPoint would claim that the subpoena subjected it to an undue burden under Rule 45(c)(3)(A)(iv), the Court would still have to ascertain the significance of that burden by investigating the cost of a forensic examination of the places where the electronically stored information may be.  Thus, nothing changes.  The only difference is that Mr. Davis's current position deprived the Plaintiff of the opportunity to proceed in this manner, if Defendant had preferred it, from the beginning of discovery.  To assert this position now at this late date simply suggests a newfangled theory by which Faber's

counsel attempts to thwart Peskoff's legitimate discovery efforts, and the Court will not allow it.

**VII.     ORDER TO SHOW CAUSE**

Finally, the Court is deeply troubled by representations made by Defendant's counsel, Mr. William Davis, both at the hearing before the Court on June 19, 2007, and in his sworn affidavit submitted to the Court on July 25, 2006.

First, at the hearing before the Court, counsel averred that "we're here on a motion to compel NextPoint and on a Rule 45 subpoena to NextPoint." Tr. 6/19/2007 at 128, 135. As I have clarified in this Memorandum Opinion, that assertion is, at best, inaccurate. The parties were before the Court on a heavily briefed motion to compel by Plaintiff regarding certain document requests made to and partially responded to by Defendant—the apparent sole remaining managing member of NextPoint—not on any third-party subpoena to NextPoint. Furthermore, Mr. Davis had made no distinction between Faber and NextPoint for purposes of responding to discovery prior to the hearing. The motion to compel sought NextPoint documents from Defendant, to which Defendant took no objection in his opposition on the basis that Faber could not respond to requests on behalf of NextPoint. In fact, Defendant interchangeably referred to Defendant as NextPoint in reference to NextPoint's production. <u>See</u> Opp. at 6 ("NextPoint produced to Peskoff DVDs containing the entirety of this electronic archive. . . . [D]efendant produced the entirety of the archive."). Moreover, as noted above, in his

opposition to the motion to compel, Defendant explicitly referenced the motion to compel documents from "non-party Plaza Street and from defendant." Opp. at 7.[8]

Second, counsel's sworn affidavit asserts that "I saw many electronic mail messages from the time period mid-2001 to mid-2003" on the produced DVDs of Peskoff's archived email account. See Davis Aff. ¶ 23.  Nothing in this record supports Mr. Davis's assertion.  The evidence is in fact quite to the contrary, including that presented by Defendant's own witness, affirmed by Mr. Davis's own words, at the hearing on June 19, 2007. See Tr. 6/19/2007 at 129-30 (Mr. Davis: "Then they say well, where are these emails from the last nine months . . . Not the two-year gap, which we all admit is – there are no email[s] that have been produced from some of the, some period of 2001 into some period of 2003.").  Defendant's counsel has presented nothing to the Court to substantiate the assertion he made under oath in his earlier affidavit; in fact, he has contradicted himself.

Therefore, I shall order Defendant's counsel to explain himself and the erroneous representations made to this Court in writing no later than September 7, 2007.

Fair being fair, however, Peskoff's counsel, Mr. Frederic Spindel, also presents conflicting testimony to the Court.  In his sworn affidavit of August 8, 2006, Spindel claims that his review of the emails in the Inbox produced by Defendant included "14 received, but unopened, emails all dated April 14, 2004." Declaration of Frederic T. Spindel Concerning Defendant's Production of Peskoff Electronic Documents [#56] ¶ 6. His hearing testimony, however, indicates that the Inbox contained "nothing." See Tr. 6/19/2007 at 105.  The existence of email in Peskoff's Inbox dated April 14, 2004, could

---

[8] Following Defendant's counsel's argument at the hearing that the parties were before the Court on motion to compel and subpoena to NextPoint, the Court asked Defendant's counsel to send a copy of the discovery

indicate his email account remained active beyond his departure in February 2004, and therefore, it is crucial to determine the accuracy of Plaintiff's counsel's statements.  In light of confusion caused by explanation of the DVD's contents and the apparent existence of two files on the DVD, one called "Peskoff Personal Folder" and one called "Ex-merge," I shall also order Plaintiff's counsel to explain the contradiction between his sworn affidavit and hearing testimony in writing no later than September 7, 2007.

Finally, the testimony conflicts as to the last date of email produced in the "Old Mail" subfolder.  Youmell recalls the date as either January or February 2004; Spindel recalls the date as April 14, 2004.  The distinction is again crucial; if Peskoff was denied access to his email account in February 2004, yet a subfolder in his account contains email dated April 14, 2004, then the Court needs explanation of how the email was moved into a subfolder of Peskoff's account following his inability to access it. Therefore, both counsel are to include in their written responses to the Court the date of the last date of email appearing in the "Old Mail" subfolder, if that is the most recent date of any email produced, and if not, the date of the most recent email produced and its location. i.e., in which folder it appears, on the DVD.

An Order accompanies this Memorandum Opinion.


\_\_\_\_\_/s/_____
JOHN M. FACCIOLA
UNITED STATES MAGISTRATE JUDGE


Dated: August 27, 2007

---

requests to the Court. Tr. 6/19/2007 at 142.  Defendant's counsel did not do so.